■ In the Matter of J. W. MAYS, INC., Respondent-Appellant, v TAX COMMISSION OF THE CITY OF NEW YORK et al., Appellants-Respondents. — In consolidated tax certiorari proceedings, the parties cross-appeal from a judgment of the Supreme Court, Queens County, dated September 11, 1979, which reduced the total assessments for the years in question. Judgment reversed, without costs or disbursements, and case remitted to Special Term for new findings and a new determination, in accordance herewith. The proceedings seek review of the following assessments:

| "Tax Year | Land | Building | Total |
|---|---|---|---|
| 1974/75 | $1,220,000 | $4,315,000 | $5,535,000 |
| 1975/76 | 1,220,000 | 4,315,000 | 5,535,000 |
| 1976/77 | 1,220,000 | 4,315,000 | 5,535,000 |
| 1977/78 | 1,220,000 | 4,315,000 | 5,535,000 |
| 1978/79 | 1,150,000 | 4,300,000 | 5,450,000". |

The property is improved with a three-story department store building with a basement, occupied primarily by petitioner as a high volume, low mark-up discount type department store (Mays) (269,667 square feet), and by Martin Paint Stores, Inc., under a lease made in September, 1974, for 16,800 square feet (or nearly 25% of the ground floor), and 7,000 square feet of the basement. A fast food snack bar (GGJ Unique Foods) is also a tenant, occupying 1,846 square feet on the ground floor and 635 square feet in the basement. Both appraisers — Sidney Panzer for the petitioner and Anthony Fasanella for the city — employed the income approach to determine value. Both adopted the actual base rentals of $65,000 per annum paid for the Martin Paint premises and $20,000 per annum paid for the snack bar premises — ignoring tax escalation clauses — but substantially disagreed in their estimates of the rental value of the Mays space and in their methods of valuing that space. Thus, petitioner's appraiser derived an estimated rental value of the Mays space by extrapolating from the actual square foot base rental paid by tenant Martin Paint, a square foot base rental considerably lower than that of tenant Snack-A-Bob (GGJ Unique Foods). His total estimated rental income was $645,000. The city's appraiser, however, reported that "The usual basis for estimating department store rentals is a base rent versus a percentage of sales." He estimated that the Mays space should generate $22,330,840 in sales. He was of the further opinion that: "Based on national standards, the rates of percentage rents for local department store chains have a range of 2.25% to 4% with a median at 3%. In consideration of the point in time, May's strong showing in sales volume, the relative newness of the structure, and that it was built as a department store, as

well as the potential in the Jamaica shopping district through its revitalization program, it is this appraiser's opinion that 3% is a fair factor in the computation of percentage rent." His conclusion as to total estimated income was $869,940. The average annual real estate tax for the years in issue was $461,625. Under the city's theory, the lease would be "net/net", i.e., tenant to pay real estate taxes. That item must thus be considered additional rent. Accordingly, under the city's calculations, the estimated rental income of the Mays space and total business space would come to a grand total of $1,331,565. Rebutting Fasanella's testimony that a department store tenant of the subject premises could pay 3% of sales volume plus real estate taxes, chain store real estate expert Leonard Marx testified for petitioner to the effect that the kind of store in issue could afford to pay a rent of not more than 2½% of its sales volume and not, in addition, real estate taxes, which he stated were "about two and a half percent of the sales." (Actually, the $461,625 average tax figure is closer to 2% of the estimated $22,330,840 gross sales of the department store.) Marx also disputed Fasanella's technique of adding the $115,015 concessionaire income to the 3% of the department store gross sales. Marx testified that services worth 6% of concessionaire gross sales of $1,200,000 were provided to those concessionaires by the department store, for which deduction from income should be made, and that in any case rather than add the $115,015 income from concessionaires, "3%" ("$36,000") of their gross sales ("$1,300,000") should have been added. Thus the respective appraisers (Panzer and Fasanella) differed sharply in their method of estimating the rental value of the property and in their estimated income figures. They also differed in their estimated expenses and capitalization methods and rates. Petitioner's appraiser assumed that the *landlord* pays the real estate taxes and that a factor should be added to the capitalization rate therefor. The city's appraiser, as noted, assumed that the *tenant* pays real estate taxes; his capitalization rate makes *no* allowance therefor. Petitioner's appraiser calculated the value of the property as follows:

| "YEAR | LAND | BUILDING | TOTAL |
|---|---|---|---|
| 1974/75 | $880,000 | $2,395,000 | $3,275,000 |
| 1975/76 | 880,000 | 2,395,000 | 3,275,000 |
| 1976/77 | 800,000 | 2,235,000 | 3,035,000 |
| 1977/78 | 800,000 | 2,235,000 | 3,035,000 |
| 1978/79 | 800,000 | 2,235,000 | 3,035,000." |

The city's appraiser, however, calculated his valuations for the years under review as follows:

| "Total Property Value | $8,080,000 |
|---|---|
| Less Land Value | 1,500,000 |
| Resultant Improvement Value | $6,580,000". |

In reducing the assessments, Special Term reasoned, in part: "Based upon all of the evidence, the court finds an average estimated annual net rental income of $883,577 (excluding the average Real Property Taxes as an item of expense), which should be capitalized at a combined rate of 18.27% (Capitalization Rate 10.5%; Average Real Property Tax Rate 7.77%) for the years 1974/75 through 1975/76. For the years 1976/77 through 1978/79 the court finds an average estimated annual net rental income of $883,577

(excluding the average Real Property Taxes as an item of expense), which should be capitalized at a combined rate of 19.265% (Capitalization Rate 10.5%; Average Real Property Tax Rate 8.765%)." In its decision, as amended, the court found that the proper values for the years in issue are:

| | "Land | Building | Total |
|---|---|---|---|
| 1974/75 | $1,220,000 | $3,616,000 | $4,836,000 |
| 1975/76 | 1,220,000 | 3,616,000 | 4,836,000 |
| 1976/77 | 1,220,000 | 3,366,000 | 4,586,000 |
| 1977/78 | 1,220,000 | 3,366,000 | 4,586,000 |
| 1978/79 | 1,220,000 | 3,366,000 | 4,586,000". |

Petitioner had derived an estimated annual net rental income (before depreciation and real estate tax) of $615,000. The city's estimated annual net income figure was $848,540, but effectively $1,331,565 if the real estate taxes (average of "$461,625") are paid by the *tenant.* Special Term's net rental income figure was $883,577. Special Term's allowance of a real estate tax factor into the capitalization rate suggests that the court agreed with petitioner that the landlord and not the tenant is responsible for payment of the real estate taxes. The court's decision, however, does not explain how it reconciled the conflicting rental value, income, expense and capitalization theories and figures. Accordingly, the case must be remanded for a new determination. (See *Matter of Elmhurst Towers v Tax Comm. of City of N.Y.,* 34 AD2d 570; see, also, *Matter of Manno v Finance Administrator of City of N.Y.,* 80 AD2d 917). Hopkins, J.P., Damiani, Lazer and Cohalan, JJ., concur.